1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Philip M. Black (SBN 308619)
Samuel Coffin (*pro hac vice* application to be filed)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Email: pblack@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PETER CANADY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.; and LUXOTTICA OF AMERICA, INC.;<br><br>Defendants. | Case No.  _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiff Peter Canady ("Canady" or "Plaintiff"), on behalf of himself and all others similarly situated, by and through his counsel, brings this Class Action Complaint ("Complaint") against Meta Platforms, Inc. ("Meta" or "the Company") and Luxottica of America, Inc. ("Luxottica") (collectively "Defendants"). Based upon personal knowledge with respect to himself, and on information and belief and the investigation of counsel as to all other matters, in support thereof Plaintiff alleges as follows:

## INTRODUCTION

1.     This is a proposed class action on behalf of owners of Defendants' artificial-intelligence-enabled eyeglasses ("Meta AI Glasses," "the Glasses," or "the Product").

2.     Unbeknownst to users, Meta AI Glasses make and retain audiovisual recordings even if users do not intend to make recordings. Meta then sends such recordings, which can include private and even intimate material from users' lives, to subcontractors—including a company called Sama based in Nairobi, Kenya—for analysis by human agents known as "data annotators."

3.     Defendants' conduct is a highly offensive invasion of privacy and repudiates prior promises that Defendants made about user privacy and data security. Indeed, Defendants advertised that the product was "designed for privacy controlled by you" and was "built for your privacy," and promised consumers that "You're in control of your data and content." These statements were false. And despite knowing and intending that Meta AI Glasses would take and transmit audiovisual recordings to third parties, Defendants never disclosed that fact to customers. If Defendants had done so, consumers would not have bought the glasses, and especially not at the premium prices they command. As one of the data annotators who reviewed users' private information said to the press: "You think that if [users] knew about the extent of the data collection, no one would dare to use the glasses."

4.     Defendants' conduct as alleged herein violates the federal Wiretap Act as amended by the Electronic Communications Privacy Act of 1986 ("ECPA" or the "Wiretap Act"), 18 U.S.C. § 2511(1)(a); the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 et seq.; the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; the California

Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770(a)(5) and § 1770(a)(9); and New York General Business Law ("GBL") §§ 349 & 350.

**PARTIES**

5.      Plaintiff Peter Canady is an individual and a resident of New Rochelle, New York.

6.      Defendant Meta Platforms, Inc. ("Meta") is Delaware corporation with a principal place of business at 1 Meta Way, Menlo Park CA 94025. According to Meta's 2025 Form 10-K, Meta's "corporate headquarters are located in Menlo Park, California" (*id.* at 51) and "California represents the majority of the [state income] tax effect" to Meta (*id.* at 122).

7.      Defendant Luxottica of America, Inc. ("Luxottica") is a Delaware corporation with a principal of business in the United States at 4000 EssilorLuxottica Place, Mason OH 45040-8114. Luxottica is the American subsidiary of multinational optical holdings company EssilorLuxottica SA. Luxottica controls a significant portion of the eyewear market in the United States through its ownership of brands including Ray-Ban, Oakley, Wayfarer and Sunglass Hut and its operation of major retailers such as LensCrafters, Pearle Vision, and Target Optical. Luxottica sells Meta AI Glasses to consumers.

8.      Together, Defendants designed, developed, marketed, and sold the Meta AI Glasses at issue herein.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. This Court has supplemental jurisdiction over the state law claims raised herein pursuant to 28 U.S.C § 1367 because those claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

10.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332, because the proposed class consists of 100 or more potential class members; the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and minimal diversity exists (Plaintiff is a citizen of New York, Defendant Meta is a citizen of California, and Defendant Luxottica is a citizen of Ohio).

11.     This Court has personal jurisdiction over Defendants because Meta's principal place of business is within this district, and Luxottica conducts substantial business in this district, including as set forth herein.

12.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because Defendant resides within this district within the meaning of 28 U.S.C. § 1391 and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## DIVISIONAL ASSIGNMENT

13.     Pursuant to Northern District of California Civil Local Rules 3-2(c), 3-2(d), and 3-5(b), assignment to the San Francisco Division of this district is proper because Defendant Meta's principal office is located in San Mateo County, California, and a substantial part of the events or omissions giving rise to the claim occurred in San Mateo County.

## FACTUAL ALLEGATIONS

### I.     Background on Meta AI Glasses

14.     In 2020, Meta entered into a partnership with EssilorLuxottica to develop, market, and sell Meta AI Glasses. On September 16, 2020, Meta (then Facebook) posted on its website: "We announced a multi-year partnership with EssilorLuxottica — the makers of eyewear from Oakley and Ray-Ban to Armani, Versace, and more. Together, we'll build and release a pair of Ray-Ban branded smart glasses in 2021. They'll be designed to capture the best of both worlds — innovative technology and fashion-forward style — and help people better connect with friends and family."[1]

15.     On September 9, 2021, Meta and EssilorLuxottica launched the first line of Meta AI Glasses, which were called "Ray-Ban Stories." This first line included two models, and started at a retail price of $299 per pair.[2]

---

[1]     https://tech.facebook.com/reality-labs/2020/9/facebook-connect-the-road-to-ar-glasses/    (last accessed March 10, 2026).

[2]     *Facebook unveils its first smart glasses*, REUTERS, (Sept. 9, 2021) https://www.reuters.com/technology/facebook-unveils-its-first-smart-glasses-2021-09-09/, (last accessed Mar. 8, 2026).

16.     Meta and EssilorLuxottica worked closely together to develop and design the Glasses, with Meta describing the Glasses as "first product to come out of our multi-year partnership with EssilorLuxottica." In a press release announcing the launch on September 9, 2021, Meta stated:

> EssilorLuxottica, Ray-Ban's parent company, and Facebook worked together from concept through final design to seamlessly integrate smart technology into an iconic form factor, which was a great challenge in and of itself. We had to re-engineer components so that everything — that's two cameras, a set of micro-speakers, a three-microphone audio array, an optimized Snapdragon® processor, a capacitive touchpad, a battery, and more — fit into the smallest possible space and the lightest possible frame. The form factor drove a lot of decisions, from speaker architecture to the camera selection.[3]

17.     EssilorLuxottica designed the Glasses to be aesthetically identical to its other popular brands, and Meta stated that the new "Ray-Ban Stories are available in 20 variations, in some of the most iconic Ray-Ban styles — Wayfarer/Wayfarer Large, Round, and Meteor[.]"[4] The only difference between the Meta AI Glasses and Luxottica's other popular brands was that the Meta AI Glasses include additional camera and microphone features that enable users to capture images, videos, and audio recordings.[5]

18.     On October 17, 2023, Defendants released a second generation of the Glasses, and on June 20, 2025, Defendants released a third generation. The second and third generations of the Glasses included certain additional features, which built on the Glasses' core function to collect photos, videos, audio-recordings, and to provide the user with AI assistance.

19.     On September 27, 2023, Meta announced a new version of the Glasses, stating that "[t]oday at Meta Connect, in partnership with EssilorLuxottica, we announced our next-generation

---

[3] "Ray-Ban and Facebook introduce Ray-Ban Stories, first-generation smart glasses," Sept. 9, 2021, https://tech.facebook.com/reality-labs/2021/9/ray-ban-and-facebook-introduce-ray-ban-stories-first-generation-smart-glasses/.
[4] *Id.*
[5] *Id.*

Ray-Ban Meta smart glasses collection. We redesigned these from the ground up, improving all the core features of the first generation while adding new capabilities that have never been seen on a pair of smart glasses before." With this new edition, the Glasses "integrated Meta AI, [Meta's] advanced conversational assistant, on Ray-Ban Meta smart glasses and optimized it for a hands-free, on-the-go experience. By saying 'Hey Meta,' you can engage with Meta AI to spark creativity, get information, and control features — just by using your voice."[6]

20.    On April 23, 2024, Meta announced that "[o]ur second-generation smart glasses, in partnership with EssilorLuxottica, have been flying off the shelves — they're selling out faster than we can make them. And just in time for sunglasses season, we're expanding the Ray-Ban Meta smart glasses collection with new styles designed to fit more face shapes so you can find the perfect pair. We're also adding new features, including updates to Meta AI, to make the glasses even more useful." This new version included a new AI update: "We started testing a multimodal AI update in December, so you can ask your glasses about what you're seeing, and they'll give you smart, helpful answers or suggestions. That means you can do more with your glasses because now they can see what you see."[7]

21.    Currently, the Glasses come in a range of models, which all feature a camera to take videos and images, a microphone to capture audio, and an AI-based "assistant" to interact with the user in various ways. Among other things, the AI assistant provides responses to oral questions and prompts, translates languages, and sends messages and phone calls. The Glasses also enable wearers to direct the built-in assistant to take photos, videos, and livestream directly to Meta's social media platforms, Facebook and Instagram.

22.    According to Meta, "[c]ertain features, like sharing from your glasses using your voice ('Hey Meta, send a photo'), may require sending your photos and videos to Meta's cloud for processing and temporary storage."[8]

---

[6]   "Introducing the New Ray-Ban | Meta Smart Glasses," Sept. 27, 2023, https://about.fb.com/news/2023/09/new-ray-ban-meta-smart-glasses/.
[7]   https://about.fb.com/news/2024/04/new-ray-ban-meta-smart-glasses-styles-and-meta-ai-updates/ (last accessed March 10, 2026).
[8]   "Learn more about cloud media on AI glasses," https://www.meta.com/help/ai-glasses/734190441863923/ (last accessed March 11, 2026).

23.    Once the Glasses are activated, wearers can connect the product through their Facebook account to the Meta View mobile app, which provides additional content editing, formatting, and sharing functions.

24.    Meta's 2025 Form 10-K describes the Meta AI Glasses and their impact on Meta's business. Meta's "products enable people to connect and share through mobile devices, personal computers, virtual reality (VR) headsets, and AI glasses." *Id.* at 6. Meta's "wearables efforts include our AI glasses and long-term AR initiatives. Our current AI glasses include the Ray-Ban Meta and Oakley Meta glasses, which feature Meta AI, our advanced conversational assistant, as well as other features such as hands-free interaction. . . . In 2025, we introduced Meta Ray-Ban Display, which combines our AI glasses with an integrated display built into the lens." *Id.* at 7. Meta's "[Reality Labs] revenue is generated from the delivery of consumer hardware products, such as Meta Quest and AI glasses, and related software and content." *Id.* at 71. "[Reality Labs] revenue in 2025 increased $61 million, or 3%, compared to 2024. The increase was driven by an increase in sales of AI glasses, partially offset by a decrease in Meta Quest sales." *Id.* at 73.

25.    Meta's Form 10-K also alludes to its ongoing partnership with Luxottica, stating "[f]or our [Reality Labs] products, our sales efforts utilize third-party sales channels such as retailers, resellers, and distribution partners, and our direct-to-consumer channel, Meta.com, and several Meta stores. These efforts are focused on driving consumer and enterprise sales and adoption of our Meta Quest portfolio of products and AI glasses." *Id.* at 8.

## II.    Defendants' Representations about Privacy and Data Security

26.    Since the launch of the Meta AI Glasses in September 2021, Meta has represented that users had control over their private data, and that such data would not be used or shared without users' consent.

27.    Indeed, in the announcement of the launch in September 2021, Meta stated that the Glasses would only "collect data that's needed to make your glasses work and function, like your battery status to alert you when your battery is low, your email address and password for your Facebook login to verify it's really you when you log into the [Meta] View app, and your WiFi connectivity. You can opt-in to share additional data — which includes things like the number of

images you captured or how long you spend taking videos — with Facebook for product development, improvement, and personalization. This setting can be changed at any time. . . . The use of Facebook Assistant for voice command-powered capture is totally optional. You can view and delete your voice transcripts, and you always have the option to turn off voice storage and/or Facebook Assistant in Settings. . . . [W]e don't use the content of your photos and videos for personalized ads. . . . Building privacy features and controls isn't enough on its own. We recognize that we need to proactively educate people on how to use Ray-Ban Stories smart glasses safely and responsibly, both for their own protection and that of others around them. . . . EssilorLuxottica shares this vision for wearables that will transform the way we connect and interact with other people and the world around us."[9]

28.     After the launch, Defendants continued to assure users and the public that the Glasses did not pose data security risks. For instance, on September 27, 2023, EssilorLuxottica issued a joint statement with Meta from EssilorLuxottica's website announcing the second generation of the Glasses at the annual "Meta Connect" conference. In the joint statement, Defendants said that "a commitment to privacy continues to be at the core of the product" and that they had made the "privacy LED light bigger and more noticeable."[10]

29.     Defendants promoted user privacy as a core feature of the Glasses, and did so pervasively across multiple advertising channels, with various such representations on Meta's website including the trademark of a Luxottica brand.

30.     For instance, Meta's website has a specific page dedicated to the privacy features of the Meta AI Glasses, which states that the Meta AI Glasses are "designed for privacy, controlled by you." The same page states: "You're in control of your data and content. Clear, easy device and app settings help you manage your information, giving you control over what content you choose to share with others, and when." It also states that the Glasses have "Privacy Settings that matter.

---

[9] "Ray-Ban and Facebook introduce Ray-Ban Stories, first-generation smart glasses," Sept. 9, 2021, https://tech.facebook.com/reality-labs/2021/9/ray-ban-and-facebook-introduce-ray-ban-stories-first-generation-smart-glasses/.

[10] *Ray-Ban and Meta launch the next generation of smart glasses*, Sept. 27, 2023 https://www.essilorluxottica.com/en/newsroom/press-releases/ray-ban-and-meta-launch-the-next-generation-of-smart-glasses/ (last accessed March 8, 2026).

Easy to access settings let you view and manage the information you share with Meta. Meta collects data needed to help ensure your glasses and app are reliable, secure, and operating normally. You can choose to share additional data to improve the experience."[11]

31.    Meta also represents that the Glasses are "built for your privacy and others' too," and that Meta takes "steps to protect people's privacy, like removing key identifiable information."[12]

32.    In addition to these representations regarding the data security of the Glasses made in public statements and on Meta's website, Defendants also assured users and the public that the Glasses would respect user and third-party privacy in the Glasses' terms and conditions.

33.    For instance, in the "Supplemental Meta Platforms Technology Privacy Policy," which governs the Glasses, Meta reassures consumers what it had promised when the Product was originally launched: that "Additional Data" would only be shared with the user's consent, and that "Meta will use Additional Data for these purposes [of improving Meta products] if you choose to share Additional Data with Meta during your initial setup, and you can change your choice at any time in Settings."[13]

34.    The privacy policy states that Meta users "can use the AI Glasses to take photos and video recordings with audio (together 'Media'). This Media is captured on your AI Glasses and sent to your App. We will collect your Media when you turn on cloud processing on your AI Glasses, interact with the Meta AI service on your AI Glasses, or upload your Media to certain services provided by Meta (i.e., Facebook or Instagram). You can change your choices about cloud processing of your Media at any time in Settings." This statement is misleading, because it implies that "media" is only collected when users affirmatively intend and elect to do so. Furthermore, this statement fails to disclose that such media will be collected at times that the user does not intend, or that it will be shared with third parties—both of which are material facts known only to Defendants.[14]

---

[11] https://www.meta.com/ai-glasses/privacy/ (last accessed Mar. 8, 2026).
[12] *Id.*
[13] https://www.meta.com/ca/legal/privacy-policy/ (last accessed March 8, 2026).
[14] *Id.*

35.     Further, in its "Supplemental Meta Platforms Technologies Terms of Service," Meta states that "we don't sell your personal data to advertisers, and we don't share information that directly identifies you (such as your name, email address or other contact information) with advertisers unless you give us specific permission."[15] Again, this statement is misleading insofar as it implies that Meta will not surreptitiously collect audiovisual recordings and transmit them to third parties.

36.     Although it is "[b]uried in Meta's AI terms of use," Meta states that it may "'review your interactions with AIs, including the content of your conversations with or messages to AIs, and this review can be automated or manual (human).'"[16] This statement, however, does not explain that audiovisual recordings will be made and transmitted to third parties. Furthermore, "given the kind of information data annotators are being asked to review, many users don't appear to be aware of that last piece of advice. Worst of all, owners of Meta's AI glasses simply don't have the option of making use of the AI features without agreeing to share data shared with Meta's remote servers. And once the data is sent, it's already often too late."[17]

37.     At no point in any public statement, press release, online advertisement, or any other context, did Meta or Luxottica disclose that the Meta AI Glasses collect audiovisual recordings, without users' knowledge, intent, or consent, to be disseminated for manual review for the purpose of developing Meta's AI model. Defendants have also never made any attempt to obtain users' consent before doing so.

**III.     Defendants' Privacy Violations Exposed**

38.     Defendants' representations regarding user privacy and data security were false, and Defendants failed to disclose to customers the truth about how their personal data would be collected and transmitted to third parties.

---

[15] https://www.meta.com/ca/legal/supplemental-terms-of-service/ (last accessed Mar. 8, 2026).
[16] Victor Tangermann, "Meta Workers Say They're Seeing Disturbing Things Through Users' Smart Glasses," March 2, 2026, https://futurism.com/artificial-intelligence/meta-disturbing-smart-glasses.
[17] *Id.*

CLASS ACTION COMPLAINT                                                                                    9

39.     On February 27, 2026, Swedish newspapers Svenska Dagbladet and Göteborgs-Posten released an investigative report (the "Report") based on whistleblower testimony revealing that contract workers at the company Sama review audiovisual recordings taken by the Meta AI Glasses. The subtitle of the Report summarizes: "Bank details, sex and naked people who seem unaware they are being recorded. Behind Meta's new smart glasses lies a hidden workforce, uneasy about peering into the most intimate parts of other people's lives."[18]

40.     From the headquarters of Sama in Nairobi, Kenya, thousands of so-called "data annotators" review user data from the Meta AI Glasses, including audiovisual recordings of highly private and even intimate conduct, including naked bodies, sexual activity, and private bodily functions such as users using the bathroom. For example, data annotators reported reviewing footage of the users' spouses changing in their own bedrooms after the Glasses had been placed on a bedside table. Data annotators also reported reviewing footage that revealed confidential information, including images of financial statements and personal text messages. Data annotators also stated that key identifiable information had not been removed from the recordings, as faces were not always blurred and specific sensitive information like credit card numbers were not always kept confidential.[19]

41.     These data annotators manually categorize the data with labels, which is then used to train AI models that Meta deploys in its products and advertising campaigns, benefitting Meta at the expense of users.[20]

42.     Data annotators reported reviewing content that was beyond what a typical user would have created, and included content of which users, or those around the users, would have been unaware based on the context that the Glasses were recording.  As one of these data annotators said to the press: "You think that if they knew about the extent of the data collection, no one would dare to use the glasses."[21]

---

[18] *She Came Out of the Bathroom Naked, Employee Says*, SVENSKA DAGBLADET, Feb. 27, 2026,  https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything.

[19] *Id.*

[20] *Id.*

[21] *Id.*

43.     As the Report states, "[a]t first glance, it appears that [users] have significant control over our data. [Meta's terms] states that voice recordings may only be saved and used for improvement or training of other Meta products if the user actively agrees. But for the AI assistant to function, voice, text, image and sometimes video must be processed and may be shared onwards. This data processing is done automatically and cannot be turned off. . . . It is not specified how much data may be analysed or for how long it may be stored. Nor is it specified who is given access to the data. . . . We asked Meta to elaborate on how sharing highly private material with subcontractors such as Sama in Kenya can be reconciled with its privacy policy. We posed the same questions to Sama. There was no response."[22]

44.     Meta's further comments to the press subsequent to the Report indicate that Meta's practices are not disclosed in any terms and conditions and that consumers are unaware of them. A Meta spokesperson reportedly told BBC News: "'When people share content with Meta AI, like other companies we sometimes use contractors to review this data to improve people's experience with the glasses, as stated in our Privacy Policy. . . . This data is first filtered to protect people's privacy.'" The latter part of this statement—that data is filtered to protect people's privacy—appears to be untrue based on the facts alleged herein. Nevertheless and moreover, "[i]n response to a request from the BBC, Meta provided a link to its Supplemental Meta Platforms Terms of Service, but it did not identify which sections of those terms covered the review of content by human contractors."[23] Indeed, Defendants do not appear to have disclosed in any manner the specific and material fact that Meta AI Glasses would transmit audiovisual data to third parties for human review.

### IV.    Plaintiff's Experience

45.     In February 2023, Plaintiff Canady purchased a pair of Meta AI Glasses at a Sunglass Hut store, a wholly-owned subsidiary of Luxottica, in Brooklyn, New York, for a retail price of $299 plus tax.

---

[22] *Id.*

[23] Chris Vallance, Regulator contacts Meta over workers watching intimate AI glasses videos, BBC NEWS, March 4, 2026, available at https://www.bbc.com/news/articles/c0q33nvj0qpo (emphasis added).

46.    Plaintiff intended to use the Glasses to take photographs without holding a camera at an upcoming wedding, and was also interested in Glasses' instant-translation function because he was planning a trip to a Spanish-speaking country without a fluency in the language.

47.    The disclosures and advertisements that Plaintiff saw and relied on before and when he purchased the Meta AI Glasses were substantially similar to and contained comparable statements to those described above.

48.    Plaintiff would not have purchased the Glasses had he known that his personal data, in the form of unintended audiovisual recordings of his use and environment, could and would be shared with third parties.

49.    Shortly after purchasing the Glasses, Plaintiff downloaded the associated Meta Mobile app using his Facebook account. Since the purchase of the Glasses, Plaintiff used them in a manner consistent with their advertised purpose, until around August 2025, when he purchased a second pair because his first pair ceased functioning.

50.    In August 2025, Plaintiff Canady purchased another pair of Meta AI Glasses from the Sunglass Hut website from his home in New Rochelle, New York for a retail price of $299 plus tax.

51.    Plaintiff did not connect his second pair of the Glasses to the Mobile App. Since the purchase of his second pair of the Glasses, Plaintiff used them in a manner consistent with their advertised purpose.

52.    At no point before, during, or after either of Plaintiff's purchase processes did Defendants disclose that the Meta AI Glasses could or would collect, store, and/or transmit Plaintiff's photographs, videos, and/or audio recordings to be reviewed by humans for the purpose of developing Meta's AI models.

53.    When Plaintiff was made aware the facts alleged herein through news reporting on or around February 27, 2026, he was shocked and dismayed to learn that his personal content was subject to being transmitted and reviewed by third parties for the purpose of developing Meta's AI models.

54.    Had he known the truth regarding the Meta AI Glasses, he would not have felt safe to use them in personal settings as he had, which would have drastically reduced their effectiveness and value to him.

55.    Plaintiff purchased both pairs of the Glasses at a substantial premium relative to Luxottica's other products because of the aforementioned AI features. For instance, comparable non-AI glasses in the identical Wayfarer model currently retail for approximately $191 per pair at Luxottica's subsidiary, Sunglass Hut.[24]

56.    Plaintiff did not feel safe using the Glasses in personal settings as he had before he learned the truth. Because of this, the Product is not worth the premium that he paid for them, because it is identical in all ways except for the aforementioned functions to other popular products sold by Luxottica.

57.    Plaintiff would use his Glasses in the future, and would purchase another pair if needed, if he knew that his personal data was not being collected and transmitted to third parties without his knowledge.

**CLASS ACTION ALLEGATIONS**

58.    Plaintiff brings this suit as a class action on behalf of himself and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action may be properly maintained as a class action, as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Fed. R. Civ. P. 23.

59.    Plaintiff seeks to represent a class of all owners of Meta AI Glasses (the "Class"). Plaintiff also seeks to represent a subclass of all owners of Meta AI Glasses in New York (the "New York Subclass").

60.    At present, Plaintiff understands "Meta AI Glasses" to include at least the following products: Ray-Ban Meta Gen 1 (Skyler), Ray-Ban Meta Gen 1 (Headliner), Ray-Ban Meta Gen 2 (Wayfarer), Ray-Ban Meta Gen 2 (Skyler), Ray-Ban Meta Gen 2 (Headliner), Oakley Meta HSTN, Oakley Meta Vanguard, and Meta Ray-Ban Display (Wayfarer). Upon completion of discovery

---

[24]    https://www.ray-ban.com/usa/sunglasses/RB2140Foriginal%20wayfarer%20classic-black/8053672058611 (last accessed March 11, 2026).

with respect to scope of the Classes, Plaintiff reserves the right to amend the class definition. Excluded from the Classes are Defendants, their parents, their subsidiaries and affiliates, and their directors and officers.

61.     While the exact number of members cannot be determined, the Classes consists of, at a minimum, thousands of persons. Defendant Luxottica reported that it sold more than 7 million Meta AI Glasses in 2025 worldwide.[25]  The members of the Classes are therefore so numerous that joinder of all members is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.

62.     There are common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members, including but not limited to:

a.     Whether the Meta AI Glasses unlawfully collected and transmitted users' personal data;

b.     whether Defendants misrepresented, concealed, omitted, and/or failed to adequately disclose that the Meta AI Glasses collected and transmitted audiovisual data to third parties;

c.     whether Defendants' conduct violated the laws, or any of them, cited in the causes of action herein;

d.     whether Defendants were unjustly enriched by their conduct as alleged herein;

e.     whether Defendants' conduct damaged members of the Classes and, if so, the measure of those damages; and

f.     whether all members of the Classes are entitled to seek equitable and/or injunctive relief from Defendants, and if so, the measure and form of such relief.

---

[25]   https://www.essilorluxottica.com/en/newsroom/press-releases/q4-full-year-2025-results/  (last accessed March 11, 2026).

63.     Plaintiff's claims are typical of the claims of class members because Plaintiff and all class members have been injured and damaged by Defendants' common course of conduct as alleged herein.

64.     Plaintiff will fairly and adequately represent and protect the interests of the other class members for purposes of Federal Rule of Civil Procedure 23(a)(4). Plaintiff is committed to pursuing this action and has retained competent counsel experienced in litigation of this type, and class action litigation in particular. Plaintiff has no interests antagonistic to those of other class members.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members to seek redress for the wrongful conduct alleged. Plaintiff's counsel, highly experienced in class action litigation, foresees little difficulty in the management of this case a class action.

## CAUSES OF ACTION

### COUNT I

**Violation of the Wiretap Act**

**18 U.S.C. § 2511(1)(a)**

*On Behalf of the Class against Meta*

66.     Plaintiff incorporates all foregoing factual allegations.

67.     Defendants, by their conduct as alleged herein, violated the Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), which subjects to suit any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" (18 U.S.C. § 2511(1)(a)); or who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection" (18 U.S.C. § 2511(1)(c)); or who "intentionally uses, or endeavors

to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection" (18 U.S.C. § 2511(1)(d)).

68.    Plaintiff and Class members were not aware of, and did not consent on an informed basis to, the interception of their personal data by the Meta AI Glasses.

69.    As to the Class and/or New York Subclass, Defendants' conduct was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d), including but not limited to intrusion upon seclusion (*see* Restat. 2d of Torts, § 652D); conversion (*see* Restat. 2d of Torts, § 511); and/or eavesdropping (see N.Y. Penal Law § 250.45). Defendants desired to cause the consequences of their acts, or believed that those consequences were substantially certain to result therefrom.

70.    Plaintiff and Class members are entitled to relief pursuant to 18 U.S.C. § 2520, including such preliminary and other equitable or declaratory relief as may be appropriate; any profits made by Defendants as a result of the violation; statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

## COUNT II

### Violation of the California Invasion of Privacy Act

### Cal. Penal Code § 630 et seq.

*On Behalf of the Class against Meta and Luxottica*

71.    Plaintiff incorporates all foregoing factual allegations.

72.    By collecting and disclosing Plaintiff's and Class Members' personal data without their informed consent, Defendants violated the California Invasion of Privacy Act, Cal. Penal Code § 630 et seq., including Cal. Penal Code § 631(a), which makes liable anyone who "reads, or attempts to read, or to learn the contents" of a communication "without the consent of all parties to the communication . . . or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or

conspires with any person or persons to unlawfully do, or permit, or cause to be done" the foregoing.

73.     Plaintiff is entitled to bring this action and seek to recover damages in the amount of five thousand dollars ($5,000) per violation, pursuant to Cal. Penal Code § 637.2 (under which "it is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages").

74.     Plaintiff also seeks punitive damages pursuant to Cal. Civ. Code § 3294 because Defendants are guilty of malice, oppression, and/or fraud as defined therein.

## COUNT III

### Violation of the California Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200

*On Behalf of the Class against Meta and Luxottica*

75.     Plaintiff incorporates all foregoing factual allegations.

76.     Plaintiff asserts this cause of action against Defendants for unlawful, unfair, and fraudulent business practices; and unfair, deceptive, untrue and misleading advertising, as defined by the UCL.

77.     Defendants' conduct violates the UCL, as the acts and practices of Defendants constitute a common and continuing course of conduct by means of "unlawful" "unfair" and "fraudulent" business acts or practices within the meaning of the UCL. Defendants' conduct was unlawful and unfair even to the extent it was not fraudulent.

78.     Defendants' conduct was **fraudulent** within the meaning of the UCL insofar as Defendants misrepresented the privacy and data security features of the Glasses, and/or omitted and failed to disclose the fact, known only to Defendants, that the Glasses were used by Meta to collect and transmit personal audiovisual data from that was then reviewed by third parties.

79.     Defendants' conduct is **unlawful**, and thus amounts to unfair competition as set forth in the UCL, in that it violates, among other things, California Civil Code §§ 1572, 1709 and 1710; the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 et seq.; the Wiretap

Act, 18 U.S.C. § 2511(1)(a); and constitutes intrusion upon seclusion, conversion, and/or eavesdropping.

80.    Defendants' conduct is **unfair**, and thus amounts to unfair competition as set forth in the UCL, in that it is immoral, unethical, oppressive, unscrupulous and substantially injurious to customers without sufficient countervailing benefit; and because it contravenes legislative policy as set forth in, *inter alia*, the laws cited in the preceding paragraph.

81.    As a direct and proximate cause of Defendants' violations of the UCL, Plaintiff and the Class suffered an injury in fact and have suffered harm. Defendants, on the other hand, have been unjustly enriched by their conduct and should be required to make restitution to Plaintiff and the Class pursuant to Business & Professions Code § 17203.

82.    Significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law. Due to these differences in proof and certainty, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law for damages. Even if legal remedies may be available, Plaintiff seeks equitable remedies in the alternative to legal remedies which are as of yet uncertain.

83.    A constructive trust should be imposed upon all wrongful or inequitable proceeds received by Defendants traceable to Plaintiff and members of the Class.

## COUNT IV

### Violation of the California Consumer Legal Remedies Act

### Cal. Civ. Code §§ 1750, et seq.

*On Behalf of the Class against Meta and Luxottica*

84.    Plaintiff incorporates all foregoing factual allegations.

85.    The California CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of services to any consumer," which include: "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …." (§ 1770(a)(5)); and/or "Advertising goods or services with intent not to sell them as advertised" (§ 1770(a)(9)).

86.    Defendants' conduct complained of herein violates Cal. Civ. Code § 1770(a)(5) and (a)(9) in that Defendants misrepresented the privacy and data security features of the Meta AI Glasses, and/or omitted facts known only to Defendants about how users' data would be collected and transmitted.

87.    The representations and omissions set forth above are of material facts that a reasonable consumer would have considered important in deciding whether to purchase the Product from Meta and Luxottica. Plaintiff and Class Members justifiably relied upon Defendants' misrepresentations and omissions to their detriment.

88.    Plaintiff and Class Members have been, and continue to be, injured as a direct and proximate result of Defendants' violations of Cal. Civ. Code § 1770, and are entitled to seek recovery, as well as to pursue costs and attorneys' fees under § 1780(e).

89.    Under the requirements of Cal. Civ. Code 1782, Plaintiff will send a CLRA letter to Defendants. If Defendants fail to rectify these issues within the time period specified therein, Plaintiff will amend this Complaint, as permitted thereby, to assert claims for additional relief, including damages and punitive damages pursuant to Cal. Civ. Code § 3294.

## COUNT V

### Violation of the New York General Business Law §§ 349 & 350

N.Y. Gen. Bus. Law §§ 349 & 350

*On Behalf of the New York Subclass against Meta and Luxottica*

90.    Plaintiff incorporates all foregoing factual allegations.

91.    GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]"

92.    GBL § 350 further declares unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

93.    As described above, while engaging in consumer-oriented trade or commerce within the State of New York during the period relevant hereto, Defendants (a) made misrepresentations regarding user privacy and the data security of the Meta AI Glasses, and/or (b) omitted and failed to disclose facts known only to Defendants, namely that users' personal data was subject to

collection and transmission to third parties for human analysis for the purpose of improving Meta's AI products.

94.    The foregoing deceptive acts and practices were directed at consumers.

95.    As a result of Defendants' false, misleading, and deceptive misrepresentations and omissions, Plaintiff and the members of the New York Subclass have suffered and continue injury.

96.    On behalf of himself and other members of the New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or statutory damages, whichever is greater, three-times actual damages, and reasonable attorneys' fees.

## COUNT VI

### Unjust Enrichment

*On Behalf of the Class against Meta and Luxottica*

97.    Plaintiff incorporates all foregoing factual allegations

98.    Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

99.    Plaintiffs and Class members conferred a benefit upon Meta in the form of valuable sensitive personal data that Meta collected from Plaintiff and Class Members without authorization and proper compensation. Meta has collected, disclosed, and otherwise misused this information for its own gain, providing Meta with economic, intangible, and other benefits, including substantial monetary compensation.

100.    Plaintiff and Class members conferred a benefit upon Luxottica by purchasing the Glasses based on false premises, which they would not have done if they knew that purchasing the Glasses would lead to the collection and dissemination of their sensitive personal data. Luxottica's misrepresentations and omissions were to its own economic gain, and it received substantial funds from Plaintiff and Class Members as a result of its conduct.

101.    The benefits that Defendants deprived from Plaintiff and Class Members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in California and every other state for Defendants to be permitted to retain any of the profit or other

benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

102.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief, together or in the alternative:

a.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23;

b.    Appoint Plaintiff as representative of the Classes, and designate the undersigned as Class Counsel;

c.    Declare Defendants' conduct unlawful;

d.    Enjoin Defendants from continuing the unlawful conduct alleged herein;

e.    Award Plaintiff and the Class damages under common law and/or by statute, including punitive damages;

f.    Grant Plaintiff and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

g.    Grant Plaintiff and the Class payment of reasonable attorneys' fees; and

h.    Grant such other equitable relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and Class Members demand a trial by jury on all triable issues.

Dated: March 11, 2026                    Respectfully submitted,

*/s/ Philip M. Black*
Philip M. Black (SBN 308619)
Samuel Coffin (*pro hac vice* application to be filed)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093

Email: pblack@wolfpopper.com
scoffin@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*